# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LUCY L. UNDERWOOD, ) | |
| ) | |
| Plaintiff, ) | Case No. 07 C 0001 |
| ) | |
| v. ) | Judge John W. Darrah |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Pending before this Court are cross-motions for summary judgment and Plaintiff's alternative motion to remand.

## BACKGROUND

On July 13, 2004, Plaintiff, Lucy Underwood, filed an application for Disability Insurance Benefits and Supplemental Security Income, alleging that she became disabled on October 29, 2003, due to acute depression, melancolia, and attention deficit disorder ("ADD"). Underwood's application and her subsequent request for reconsideration were denied. Underwood's request for a hearing was granted.

Underwood was born in February 1966. Underwood is 5'2" tall and weighs approximately 200 pounds. Underwood completed eleven years of school.

In October 2003, Underwood's employment as a journeyman plate maker at a newspaper was terminated due to a change in technology that caused the elimination of her position. Underwood had been employed in that position for approximately eighteen years.

Underwood began seeing a psychiatrist in 1993. Underwood initially saw Dr. Aberra, then Dr. Belazario, then Dr. Rubeena Mian, and then Dr. Mercia. On October 24, 2003, Dr. Mian reported that Underwood has been laid off from work and was upset but coping, tearful. On May 25, 2004, Dr. Mian reported that Underwood has difficulty keeping a job and is tearful.

On August 27, 2004, Dr. Mian completed a Psychiatric Report, in which he diagnosed Underwood with depression and ADD. Dr. Mian noted that Underwood had a depressed mood and that her present daily activities consisted of "depression" and "wak[ing] up mak[ing] breakfast and watch[ing] T.V." Underwood was able to care for herself and cook but was unable to shop or manage her own funds. Underwood was "able to get along interpersonally." Her speech was normal, her thought processes were clear with no hallucinations or delusions, and she was fully orientated. Dr. Mian prescribed Ritalin.

On September 16, 2004, a non-treating, non-examining state agency doctor, E. Kuester, completed a Mental Residual Functional Capacity ("MRFC") Assessment and a Psychiatric Review Technique Form ("PRTF"), in which he noted that Underwood had mental impairments of ADD and Depressive Disorder non-specific that fell under the following categories: 12.02 for Organic Mental Disorders and 12.04 for Affective Disorders. Dr. Kuester determined that the mental impairments were severe and caused Underwood moderate limitations in: (1) social functioning and maintaining concentration, persistence and pace; (2) the ability to understand, remember and carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods, as well as work in coordination or proximity to others without being distracted; (4) and the ability to complete a normal workweek, interact with the general public, accept instructions and criticism from supervisors, set realistic goals, and travel

2

in unfamiliar places. Dr. Kuester also found Underwood had mild limitations in daily living activities, concluding that she could perform "simple, routine tasks adequately" but that she "shouldn't have to interact extensively or deal with the public."

On October 22, 2004, Dr. Mian noted Underwood was depressed and completed a MRCF and a Physician Residual Functional Capacity ("PRFC") form. The MRCF stated that Dr. Mian had been Underwood's treating doctor since 2002 and had seen Underwood every two to three months since that time. He diagnosed Underwood with depression and ADD with social and occupational stressors. Dr. Mian noted Underwood as having a depressed mood, and her prognosis was "fair." Underwood's symptoms included mood disturbance, difficulty thinking or concentrating, emotional withdrawal or isolation, easy distractability and short-term memory impairment. Dr. Mian opined that Underwood would miss more than four days of work per month due to her mental impairments. In the PRFC, Dr. Mian opined that Underwood is not a malingerer, that emotional factors contributed to her impairments, that her mental impairments interfered with her ability to pay attention and concentrate, and that she was incapable of performing even low stress work.

On January 1, 2004, Dr. Mian noted Underwood was caretaking for her grandmother, niece and nephew, working on going back to work, and her depression and ADD were stable. On March 12, 2004, Underwood was "doing fairly well"; and on May 5, 2004, she was "stable." In May 2004, Underwood told Dr. Mian that she had difficulty keeping a job, she was tearful, and that she was thinking of claiming disability. On June 25, 2004 and August 27, 2004, she was "stable."

On January 21, 2005, Dr. Mian noted that Underwood showed increased depression and a continued need for Ritalin. Underwood's condition was stable while using her medications but had not improved throughout 2005.

On January 4, 2006, Dr. Mian transferred Underwood's case to Dr. Mercia. Dr. Mercia noted Underwood had depression and ADD. On March 8, 2006, Dr. Mercia noted that Underwood was "more depressed." On April 7, 2006, Dr. Mercia noted that Underwood was "still tearful." From February 2005 through March 2006, Underwood had been prescribed Ritalin, Methylphenidate, and Effexor.

On May 15, 2006, Dr. Ana A. Gil performed a consultative psychiatric evaluation of Underwood. Dr. Gil found Underwood had major recurrent depression with psychotic features, which were moderate in severity, and ADD. Dr. Gil noted that Underwood described neurovegatative symptoms of depression and auditory mood congruent hallucinations and found Underwood as having mild psychomotor agitation, a sad, tearful and restricted affect and a moderately depressed mood. Dr. Gil noted Underwood's symptoms of feelings of hopelessness, worthlessness and passive suicidal ideation with impairment in her immediate memory, as well as difficulty sleeping and taking public transportation.

Dr. Gil also completed a Medical Source Statement ("MSS"), in which she opined that Underwood had moderate limitations in the ability to understand, remember and carry out detailed instructions; moderate limitations in the ability to make judgments on simple work-related decisions; slight limitations in the ability to understand, remember and carry out short and simple instructions; moderate limitations in the ability to interact appropriately with the public, supervisors and co-workers; and moderate limitations in the ability to deal with work pressure and to respond appropriately to changes in a work setting.

On the mental status examination, Underwood was cooperative, had good eye contact, was tearful, and had mild psychomotor agitation. She was fully orientated and related well. Her affect was sad, tearful, restricted and appropriate to content; her mood was moderately depressed. Underwood's thought processes were logical; and her speech was normal, coherent and relevant. She had difficulty repeating digits both forward and backward. She could report the route she took to the clinic and recent news. She correctly stated her birth date, address and school name. She was able to perform simple calculations accurately. Her general knowledge, testing of similarities and differences, and testing of abstractions were adequate.

On May 17, 2006, Dr. Mercia noted that Underwood was stable with the Ritalin and Effexor but that the amounts needed to be increased because Underwood was not improving.

On June 26, 2006, a hearing was held before Administrative Law Judge Regina Kossek. Underwood testified that she quit school after completing the tenth grade and did not receive her Graduate Equivalent Degree. She is single, lives with her parents, and can do simple mathematics but cannot count change. She can read but has to re-read papers ten to fifteen times because she has a hard time concentrating and remembering what she has read and often loses her train of thought. She can write out a short grocery list and has trouble taking phone messages unless the message is very simple.

After being laid-off from work, Underwood collected employment compensation for six months but was unable to return to any work or go out and get any work because of her condition. Underwood made a series of harassing and threatening phone calls to her former boss and boss's daughter after her layoff.

Underwood has been seeing a psychiatrist since 1993 for her depression and ADD, but she does not go as often as she would like to because she cannot afford to go that often. She has

been taking Ritalin for her ADD since 1993 and Effexor for her depression since May of 2006. She does not clean, exercise, or go out; she has no hobbies; her mother does her laundry. Underwood sleeps all day and is afraid of driving. She does not think about the future, only having "grim thoughts."

Underwood described her previous employment as requiring frequent scolding due to mistakes because of her poor memory and the need to take off five to six days per month. She has trouble with public transportation and cannot be near crowds or more than five people. She is anxious around strangers and brought a stuffed animal with to the hearing for comfort. She loses her patience with others and is also afraid of others. She is often forgetful and loses things. On a good day, she is able to watch television; but on a bad day, she sleeps all day because she feels there is nothing for which to get up. She was generally tired and had side effects from her medications. Underwood has taken Zoloft for her depression but is afraid of medications after having a negative experience with another medication, BuSpar, which caused her hallucinations and irritability.

Underwood's sister, Lisa Elrod, also testified at the hearing. Elrod testified that Underwood sleeps a lot, rocks, is fidgety, irritable, agitated, and the littlest thing sets her off. Elrod's children scare Underwood, and Underwood is often on "pins and needles." Underwood's condition got worse following Underwood's loss of her job. Elrod had trouble getting Underwood to focus, and Underwood was not able to take care of herself.

William Schweihs, a Vocational Expert ("VE"), testified that Underwood's past work as a journeyman plate maker was medium to heavy skilled work as she performed it and light skilled as generally performed. The VE opined that Underwood did not have any skilled transferable skills because that past work is now all computerized. However, Underwood did

6

have transferable skills relating to the operation of equipment. In response to ALJ Kossek's hypothetical – an individual with Underwood's background who can perform work with simple one or two step tasks that are low stress, "meaning minimal decision-making, minimal changes in the work setting, requiring use of limited judgment," with only occasional interaction with the public, co-workers and supervisors – the VE testified that the individual could not do Underwood's past work and would have trouble in a factory setting due to the need to have minimal changes in the work setting. He opined that the hypothetical person could perform some factory work, such as an assembler or packer. There are 7,000 assembler jobs and 8,000 packer jobs at all exertional levels for this work; but if the individual is limited to only sedentary, light and medium work, there would be 5,500 assembler jobs and 5,000 packer jobs. The VE used a factor of 30 as a multiplier to extrapolate regional numbers.

Under a second hypothetical by ALJ Kossek – an individual with the same previous limitations and the additional limitation of not being able to deal with changes at the frequency of at least one time per week – the VE opined that the additional limitation would eliminate all work.

Underwood's counsel posed two other hypotheticals to the VE: a hypothetical individual as stated in the first hypothetical with the additional limitation of missing five to six work days a month – the VE opined that this individual could not perform the identified jobs; and a hypothetical individual that had outbursts and reacted negatively to supervisors or co-workers once a week – the VE opined this individual also would not be able to perform the identified jobs.

In July 2006, ALJ Kossek issued his decision, finding that Underwood was not disabled within the meaning of the Social Security Act. ALJ Kossek found Underwood to have severe depression and ADD that did not meet or medically equal any of those included in the Listing of Impairments at 20 C.F.R. pt. 404, subpt. P, app. 1. Underwood's subjective allegations were only partially credible. Underwood did not have any exertional limitations but was limited to "low-stress, simple 1-2 step work tasks involving no more than minimal decision-making and changes in the work-setting, limited judgment, and no more than occasional interaction with the public, co-workers and supervisors." Based upon the VE testimony, ALJ Kossek found that Underwood was capable of performing work as an assembler (5,5000 - 7,000 jobs) and hand packer (5,000 - 8,000 jobs).

## ANALYSIS

An ALJ's findings constitute the final decision of the Commissioner of the Social Security Administration if the Appeals Council finds no basis for further review. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (*Smith*). Under such circumstances, the decision of the ALJ is the decision reviewed by the district court. *Ears v. Secretary of the Dept. of Health & Human Serv.*, 983 F.2d 815, 816 (7th Cir. 1993). In this review, the district court examines the entire record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000) (*Powers*). The ALJ's decision will not be reversed if it is supported by substantial evidence, which is evidence "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*Perales*); *Powers*, 207 F.3d at 434.

In order to qualify for disability benefits, a claimant must be "disabled" under the Social Security Administration. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (*Briscoe*). The determination of whether a claimant suffers from a disability as defined in the Social Security Act is conducted through a five-step inquiry, evaluated in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

The claimant has the burden of proof for steps 1 through 4. The commissioner has the burden of proof for step 5. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (*Clifford*).

Underwood first argues that ALJ Kossek's residual functional capacity ("RFC") and hypotheticals were erroneous because she failed to consider all of Underwood's impairments and ignored evidence in the record.

An "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. The "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p (emphasis in original).

In determining Underwood's RFC, ALJ Kossek reviewed Dr. Mian's August 27, 2004 Psychiatric Report, Dr. Mian's March 2005 MRFC, Dr. Mian's treatment notes, Dr. Meccia's treatment notes, Dr. Gil's notes and reports, and Dr Kuester's September 2004 MRFC and PRTF. As to Dr. Kuester, ALJ Kossek noted that Dr. Kuetser concluded that Underwood could perform simple tasks in a regular work setting but that she should not have to interact

9

extensively with the public. ALJ Kossek further reviewed that Dr. Kuester found Underwood to be stable, euthemic, concentration moderately decreased and a diminished appropriate response to criticism. ALJ Kossek found that these findings were consistent with the later Medical Source Statement and were to be given weight. However, ALJ Kossek's RFC determination failed to take into consideration all of Dr. Kuester's findings, including that Underwood's mental impairments were severe and caused Underwood moderate limitations in: (1) social functioning and maintaining concentration, persistence and pace; (2) the ability to understand, remember and carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods, as well as work in coordination or proximity to others without being distracted; (4) the ability to complete a normal workweek; (5) the ability to interact with the general public, accept instructions and criticism from supervisors; (6) and the ability to set realistic goals. These limitations found by Dr. Kuester were not included in ALJ Kossek's RFC determination and are relevant to that determination. *See* SSR 96-8p; SSR 96-9p; 20 C.F.R. § 404.1545(a); *Young v. Barnhart*, 362 F.3d 995, 1002-03 (7th Cir. 2004) (*Young*) (RFC and hypotheticals must take into account all of the applicant's medically determinable impairments).

Furthermore, these limitations were not included in ALJ Kossek's hypothetical questions asked of the VE. Nor did ALJ Kossek's decision take into consideration or address the VE's testimony, elicited by Underwood's counsel, that a hypothetical individual as identified by ALJ Kossek that had additional limitations found by Dr. Kuester – missing five or six days of work a month or having outbursts and reacting negatively to supervisors or co-workers once a week – would not be able to perform the identified jobs. Similarly, the hypotheticals did not include the limitation of Underwood's social functioning issues, including her history of making threatening and harassing telephone calls, her social withdrawal, and her diagnosis of having psychotic

10

features to her depression. A VE's testimony as to what jobs a claimant could perform based on the answers to hypotheticals asked of the VE, and relied upon by the ALJ, must incorporate all relevant limitations the claimant suffers. *See Young*, 362 F.3d at 1003, 1005; *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003).

ALJ Kossek's failure to take into account all of Underwood's limitations in her RFC finding and in the answers to hypotheticals asked the VE, which resulted in a finding that Underwood was capable of performing work in the national economy, constitute legal error.

Plaintiff also argues that ALJ Kossek's finding that Underwood was not a credible witness was erroneous. Plaintiff alleges that the ALJ failed to follow the SSR 96-7p requirements in making the credibility determination and that the ALJ ignored the fact that the Plaintiff's allegations need only be reasonably related to her medical diagnosis in order to be credible. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); 20 C.F.R. § 404.1529; *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (a court has greater freedom to review an ALJ's credibility decision if the credibility determination does not rest on objective factors or fundamental implausibilities rather than subjective considerations, such as the claimant's demeanor). However, in light of the above findings, this argument need not be considered at this time.

## CONCLUSION

For the foregoing reasons, Underwood's and Defendant's motions for summary judgment are denied. Plaintiff's Motion to Remand is granted. The decision of the ALJ is vacated, and this proceeding is remanded for further proceedings consistent with this opinion.

Dated: September 20, 2007

JOHN W. DARRAH
United States District Court Judge